**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**Southern Division**
**--------------------**

ANTHONY LYNCH-BEY, JAMES A. CLARK,
HOLLEY DAVIS, JOHNATHAN MARTIN-EL,
BILLY RAY ABERNATHY, BRIAN HAGOOD-BEY,
BRIAN LUCKETT, and TIMOTHY GRANDERSON,
on behalf of themselves and all other
similarly situated prisoners,
        Plaintiffs,

JUDGE : Friedman, Bernard A.
DECK  : Judge Prisoner Deck
DATE  : 06/15/2005 @ 13:19:56
CASE NUMBER : 2:05CV72378
PRIS LYNCH-BEY, ET AL VS.
PATRICIA CARUSO, ET AL (NSI) JMC

-vs-

*MAGISTRATE JUDGE KOMIVES*

PATRICIA CARUSO, Director Michigan Department
of Corrections, JOHN RUBITSCHUN, Chairperson
Michigan Department of Corrections Parole Board,
CHARLES BRADDOCK, MIGUEL BERRIOS, MARIANNE
SAMPER,BARBARA SAMPSON, JAMES ATTERBERRY,
JAMES QUINLAN, ARTINA TINSLEY HARDMAN,
ENID LIVINGSTON, and STEPHEN DEBOER,
Michigan Department of Corrections Parole
Board Members, in their official capacities,
        Defendants.

_____/

*Plaintiffs Motion for Class Certification*

    The Plaintiff's in pro se, pursuant to Rule 23(b)(2) and Rule 23(g) of the Federal Rules of Civil Procedure moves for certification of class action and appointment of class

counsel, and states:

    1. The Plaintiff's are all parolable lifers serving their sentences in the custody of the Michigan Department of Corrections (MDOC).

    2. Plaintiffs were convicted and sentenced prior to the October 1, 1992 statutory amendments to M.C.L. 791.234(6) and the "Life Means Life" policy and practice.

    3. All Plaintiffs have been subjected to the parole board's new "Life Means Life" policy and practices, and have been denied any consideration, eligibility for parole, and have denied, passed over, told "no interest" in pursuing, or otherwise rejected or deferred based on the new statutory amendments of 1992, 1999 and the life means life policy and practice.

    4. The parole laws substantially changed in 1992 and 1999; corresponding with these changes, the parole board now has a life means life policy and practice, something unheard of when Plaintiffs' crimes and sentences took place.

    5. Although the "Life Means Life" policy is an agency rule for purposes of Michigan Administrative Procedures Act (APA), the Defendant's circumvented the notice and content requirements of the APA by intentionally failing to promulgate the Life Means Life rule.

    6. All changes in the parole laws and policies have been retroactively applied to Plaintiffs and a large class of parolable lifers "sweepingly."

    7. However, if the Court declares the life means life policy invalid, it may eliminate a cut-off date and broaden the scope of the class from roughly 850 prisoners to roughly 2000 prisoners.

    8. In their complaint and motion for a preliminary injunction, Plaintiffs allege that such changes, when retroactively applied, violate the ex post facto and due process clauses of the U.S. Constitution.

    9. Several Michigan lifers have filed habeas petitions in this district court raising ex post facto and due process grounds;[1] likewise, the University of Michigan Clinical Law Program, Professor Paul D. Reingold on behalf of seven lifer-prisoners, filed a class action complaint against the same Defendants named here. See Foster-Bey, et al. v. Rubitschun, (E.D.Mich No. 05-7138)(Nancy G. Edmunds, J.).

---

  [1] See Foster-Bey, et al. v. Rubitschun (No. 05-71318)(class action § 1983); Alexander v. Birkett (No. 04-CV-73953-DT); Bazzetta v. Stovall (No. 04-CV-73307-DT); Kincald v. Jones (No. 04-CV-71090-DT); and Louis Moore v. Jackson (No. 04-CV-72344-DT).

counsel, and states:

1. The Plaintiff's are all parolable lifers serving their sentences in the custody of the Michigan Department of Corrections (MDOC).

2. Plaintiffs were convicted and sentenced prior to the October 1, 1992 statutory amendments to M.C.L. 791.234(6) and the "Life Means Life" policy and practice.

3. All Plaintiffs have been subjected to the parole board's new "Life Means Life" policy and practices, and have been denied any consideration, eligibility for parole, and have denied, passed over, told "no interest" in pursuing, or otherwise rejected or deferred based on the new statutory amendments of 1992, 1999 and the life means life policy and practice.

4. The parole laws substantially changed in 1992 and 1999; corresponding with these changes, the parole board now has a life means life policy and practice, something unheard of when Plaintiffs' crimes and sentences took place.

5. Although the "Life Means Life" policy is an agency rule for purposes of Michigan Administrative Procedures Act (APA), the Defendant's circumvented the notice and content requirements of the APA by intentionally failing to promulgate the Life Means Life rule.

6. All changes in the parole laws and policies have been retroactively applied to Plaintiffs and a large class of parolable lifers "sweepingly."

7. However, if the Court declares the life means life policy invalid, it may eliminate a cut-off date and broaden the scope of the class from roughly 850 prisoners to roughly 2000 prisoners.

8. In their complaint and motion for a preliminary injunction, Plaintiffs allege that such changes, when retroactively applied,  violate the ex post facto and due process clauses of the U.S. Constitution.

9. Several Michigan lifers have filed habeas petitions in this district court raising ex post facto and due process grounds;[1] likewise, the University of Michigan Clinical Law Program, Professor Paul D. Reingold on behalf of seven lifer-prisoners, filed a class action complaint against the same Defendants named here. See Foster-Bey, et al. v. Rubitschun, (E.D.Mich No. 05-7138)(Nancy G. Edmunds, J.).

---

[1]  See Foster-Bey, et al. v. Rubitschun (No. 05-71318)(class action § 1983); Alexander v. Birkett (No. 04-CV-73953-DT); Dazzetta v. Stovall (No. 04-CV-73307-DT); Kincaid v. Jones (No. 04-CV-71090-DT); and Louis Moore v. Jackson (No. 04-CV-72344-DT).

10. The complaints do not fairly encompass the claims presented by Plaintiffs here, and it does not appear that the Plaintiffs in Foster-Bey (through their counsel) will adequately protect the interests of the Plaintiffs in this case.

11. Plaintiff Lynch-Bey exhausted administrative remedies by filing a grievance with the MDOC at all 3 levels of its grievance process. See Class Action Complaint (Exh. 53, pp. 31-33, ¶¶ 217-223); all other Plaintiffs invoke the doctrine of "vicarious exhaustion." See Hattie v. Hallock, 8 F.Supp.2d 685, 689 (N.D.Ohio 1998).

12. Rather than address the grievances in a straightforward manner, Defendants intentionally sidestepped the concerns by placing form over substance - Lynch-Bey presented facts that the parole board was violating its statutory mandate, and the constitution on several scores; however, in the end, Defendants determined that no MDOC policy directive had been violated.

13. Judicial economy will be served by certifying a class, so that all challenges to the parole board's treatment of parolable lifers can be heard as soon as possible and in one forum, and a single appeal can follow, if that be the case.

14. Class certification will also afford the Plaintiffs the chance to conduct discovery in a more concentrated manner, which would aid the Court in deciding the legal issues.

15. There are presently about 850 parole eligible lifers in the MDOC (they have served the minimum 10 years); of that, 471 have served more than 20 years, 270 have served 25 years, and 97 have served more than 30 years. See CAPPS High Cost of Denying Parole, Complaint (Exh. 38, p. 32, ¶ 216); according to the MDOC's policy these prisoners received Grid recommendation scores.

16. Thus, well over 700 lifers fit the proposed class, while over 100 did not receive grid scores and fit in the subclass; this satisfies the numerosity requirement.[2]

17. All questions presented in this action meet the common criteria; and every member of the class and subclass have been and continues to be injured by the Defendants' conduct, and the challenges will raise the same, or substantially the same issues of law and fact for every member of the class and subclass.

18. The essence of the named Plaintiffs' claims are typical of those of the class and subclass, and the nature of the injury is the same.

19. The named Plaintiffs will be able to serve as class representatives; their interests are the same as the class; the named Plaintiffs have vigorously pursued their claims and

---

[2] See footnote number 4, Infra, at page 7 Brief in support of this motion.

will continue to do so in the interests of the class.

20. The mere fact that Plaintiffs are proceeding in pro se, makes it virtually impossible for them to satisfy the "competent counsel" requirement of Fed.R.Civ.P 23(g)(1)(B)&(C).

21. Therefore, Plaintiffs ask the Court to appoint class counsel; without counsel, the Plaintiffs will be severely hampered in presenting their claims to the Court.

22. Since the issues of standing, preliminary injunction, and class certification are often intermingled, see e.g., City of Los Angeles v. Lyons, 461 US 95, 111, 103 S Ct 1660, 75 L Ed 2d 675 (1983), Plaintiffs incorporate herein by reference their complaint and motion for a preliminary injunction and supporting brief.

23. This motion is supported by the attached brief.


Respectfully submitted by Plaintiffs in pro se:


Anthony Lynch-Bey #146972

Holley Davis #116440

Billy Ray Abernathy #150693

Brian Luckett #217822


James A. Clark #154102

Johnathan Martin-El #173004

Brian Hagood-Bey #183904

Timothy Granderson #225169


Dated: May 13, 2005

4

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### Southern Division

-----------------------

ANTHONY LYNCH-BEY, JAMES A. CLARK,
HOLLEY DAVIS, JOHNATHAN MARTIN-EL,
BILLY RAY ABERNATHY, BRIAN HAGOOD-BEY,
BRIAN LUCKETT, and TIMOTHY GRANDERSON,
on behalf of themselves and all other
similarly situated prisoners,

              Plaintiffs,

Case No. 05 - 72378

Hon. Bernard A Friedman

U.S. Mag. Judge Komives.

-VS-

PATRICIA CARUSO, Director Michigan Department
of Corrections, JOHN RUBITSCHUN, Chairperson
Michigan Department of Corrections Parole Board,
CHARLES BRADDOCK, MIGUEL BERRIOS, MARIANNE
SAMPER, BARBARA SAMPSON, JAMES ATTERBERRY,
JAMES QUINLAN, ARTINA TINSLEY HARDMAN,
ENID LIVINGSTON, and STEPHEN DEBOER,
Michigan Department of Corrections Parole
Board Members, in their official capacities,

              Defendants.

**FILED**

JUN 1 5 2005

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

_____/

*Plaintiffs Brief in Support of
Motion for Certification of Class Action*

## Controlling Authority for The Relief Sought

### Legal Standard - Certification and Maintenance of Class Actions

Federal Rule of Civil Procedure 23 governs certification and maintenance of class actions. Rule 23 provides, in relevant part:

> **(a) Prerequisites to a Class Action.** One or more members of the class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

> **(b) Class Action Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of

> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class...

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

> (3) the court finds that the questions of law or fact are common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

This Court must conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are met before certifying a class. General Tel Co. v. Falcon, 456 US 147, 161, 102 S Ct 2364, 72 L Ed 2d 740 (1982). This Court has broad discretion in deciding whether to certify a class. In re American Med. Sys., Inc, 75 F.3d 1069, 1079 (6th Cir.1996). Our Sixth Circuit says "that discretion must be exercised within the framework of Rule 23." Id. at 1079. The party seeking class certification bears the burden of proof. See id. (citing Falcon, 457 US at 161, 102 S Ct 2364). Although this Court may, and often must,

look beyond the bare pleadings in the case, it may not examine the merits of parties' claims or defenses.* See <u>Eisen v. Carlisle & Jacquelin,</u> 417 US 156, 94 S Ct 2140, 40 L Ed 2d 732 (1974).

To make a proper determination with respect to Plaintiffs' motion for class certification, this Court must address three distinct issues: (a) the adequacy of the class definition proposed by the Plaintiffs; (b) the four prerequisites to certification provided in Fed.R.Civ.P. 23(a)(that is, numerosity, commonality, typicality, and adequacy of representation); and (c) The specific subcategories provided in Fed.R.Civ.P. 23(b).

Plaintiffs will address each of these issues in turn; the subcategories of Rule 23(b) are addressed within each particular issue, and in conclusion.

---

* Notably, a motion for preliminary injunction is filed contemporaneous with this motion. The first factor of the preliminary injunction standard asks "whether the moving party has a strong likelihood of success on the merits." <u>DeLorean Motor Co. v. DeLorean,</u> 755 F.2d 1223, 1228 (6th Cir.1985).

## A. Application of Standard of Review

For ease of reading, the Plaintiffs adopts by reference the facts and argument set forth in their class action complaint and motion for preliminary injunction in voluminous detail Without reinventing the wheel, Plaintiffs, a concise statement of the Plaintiffs' claims are:

Plaintiffs allege that: (I) the ex post facto clause of the U.S. Constitution is violated where the 1992 and 1999 statutory amendments, "life means life" policy and practice, judicial interpretations of parole laws cumulatively with the composition and philosophy of the parole board was designed to increase the measure of punishment for Plaintiffs and all other similarly situated parolable lifers, as follows: (a) the 1992, 1999 statutory amendments adding "public safety" language together with the parole board's new philosophy making "protection of the public of foremost importance to the public safety factor has altered in practice the fundament for reviewing lifer cases; (b) the automatic designation of Plaintiffs and all parolable lifers as non-parolable lifers (or the equivalent thereof) effectively resentences Plaintiffs and imposes qualitatively different and more severe punishment characteristically suffered by person convicted of their crimes; (c) the possibility that Plaintiffs would automatically as a matter of law be required to serve the a sentence of life without the possibility of parole was simply not a possibility during Plaintiffs crimes and sentences; (d) by giving the word "eligible" its new hypertechnical meaning the parole board has effectively changed the substance of M.C.L. 791.234(6) rendering it invalid on its face or as applied; (e) the retroactive interpretation and application of the "life means life" policy coupled with the new hypertechnical meaning of the word "eligible" created a more onerous methodology for determining Plaintiffs parole suitability; (f) there is a significant risk of increased punishment where the "life means life" policy is a "fixed rule" designating Plaintiffs forever ineligible for parole consideration which was not part of the decision-making criteria used by the Board during Plaintiffs crimes and sentences; (g) the "life means life" policy and practice enacted after Plaintiffs' crimes and sentences represents a "sea change" in long settled policies and practives of the parole board, is retroactive in its interpretation and application and changes the substance of the enabling statute to make it unsonstitutionally vague.

Plaintiffs asserted constitutional violations in claim: (II) where the Plaintiffs' sentences are based on the MDOC's longstanding written policies, interpretations, representations and application of the parole laws concerning parolable lifers and this was fostered and shared by both the judicial and executive branches of Michigan government as well as the bar for over fifty-years, the due process clause of the Fourteenth Amendment to the U.S. Constitution is violated because Plaintiffs have not been sentenced on accurate information when as here, the MDOC subsequently makes abrupt changes in its interpretation and application of the laws governing parolable lifers and retroactively applies it to Plaintiffs and all similarly situated lifers imprisoned beforehand with the intent to injure them unjustifiably, as follows: (a) the continued retroactive application of the "life Means life" policy means that as a matter of law, prior to any consideration hearings the Board has arbitrarily found Plaintiffs unsuitable for parole release; (b) the

1

possibility that Plaintiffs would automatically as a matter of law serve the remainder of their natural lives in prison without the possibility of parole except if something exceptional happens was simply not a possiblity at the time of their crimes and sentences; (c) the retroactive designation of Plaintiffs as non-parolable lifers effectively resentences them and imposes qualitatively different and more severe punishment than characteristically   suffered by a person convicted of a their crimes without any prior notification or hearing whtsoever; (d) the MDOC's life means life policy is   fixed rule meaning that as a matter of law plaintiffs are forever denied their statutory right to meaningful parole consideration when eligible; (e) the parole board retroactively changed the commonly understood meaning of the word "eligible" and supplanted a new hypertechnical meaning to support its life means lifer policy and practice which is intended to injure Plaintiffs; (f) by rescinding the Guidelines for Commutation recommendations policy and Grid and in failing to promulgate rules providing procedures for the manner in which paroles shall be considered and the criteria to be used to reach release decisions in parolable lifer cases, the director set the stage for imposition of the life means life policy and allowed Defendants to act with unbridled discretion; (g) as applied to Plaintiffs and all similarly situated lifers the life means life policy and practices effectuated by Board members with political and pecuniary interests in denying fair procedures in lifer cases is an arbitrary abuse of the discretion bestowed upon it by statute; and (h) taken together or individually the parole board's life mesn life policy is an arbitrary state action that shocks the conscience and is so unfair that it must be deemed inconsistent with notions of fundamental fairness.

Finally Plaintiffs challenged the face of the statute as unconstitutional: (III) the MDOC's new interpretation of its enabling parole statute renders the statute unconstitutionally vague and it cannot stand if the Court looks to M.C.L. 791.234(6) and applies the normal tools of statutory construction.

The violations are being applied to all parolable lifers serving sentences in the MDOC. The Plaintiffs assert that no MDOC staff can explain to them what criteria the MDOC uses to determine parole eligibility in their cases. In other words, Defendants and their agents cannot - like the "old" Board used to do - explain to a lifer what s/he should be doing to earn parole. In fact, Defendant keep "criteria for parole" of lifers shrouded in secrecy. The MDOC's written policies merely direct staff how to prepare the necessary paperwork for a five year review. The complaint describes the class and subclass as:

> THE CLASS: All parolable lifers in the custody of the Michigan Department of Corrections; committing their crimes prior to October 1, 1992; sentenced prior to October 1, 1992; were screened by the Department of Corrections staff using Policy Directive PD-DWA-45.12 and received a Grid score; have served in excess of the Grid score and continue to be denied parole consideration by the new post-1992 parole board, passed over, no interest, or otherwise rejected or deferred using its life means life policy, procedures, and practices.

> THE SUBCLASS: All parolable lifers in the custody of the Michigan Department of Corrections; committing their crimes and convicted prior to October 1, 1992; sentenced prior to October 1, 1992; screened by Department of Corrections staff receiving a standard 20 years earliest release date; and

being denied parole consideration by the new post-1992 parole board, passed over, no interest, or otherwise rejected or deferred using its life means life policy, procedures, and practices.

There is a strong need for class action. Since the changes in parole laws and policy there has been a flood of complaints challenging the actions of the Michigan Parole Board. Moreover, the "Life Means Life" policy and practice has created confusion in the judiciary - judges don't know how to sentence prisoners who face life or any term of years - and while the case Foster-Bey, et al, is a class action challenging the parole board on the same grounds, that complaint does not fairly represent the Plaintiffs here. Initially, Plaintiffs note that it is arguable whether Foster-Bey will obtain jurisdiction in light of the preclusion doctrine, see Smith v. Oakland Co Circuit Court, 344 F.Supp.2d 1030 (E.D.Mich.2004)(explaining Rooker/Feldman doctrine).[3] Also, from what Plaintiffs have read and without saying anything detrimental too the Foster-Bey case, Plaintiffs assert that Foster-Bey raises ex post facto and due process claims, however, they are substantially different in many respects. For example, Foster-Bey does not complain that the "life means life policy is a rule which should have been promulgated through the APA, but wasn't; it does not allege that the Board gave the word "eligible" a meaning which changes the statute substance, nor does it assert that the statute is unconstitutionally vague.

Although a companion case in the sense that it brings similar claims, as it stands now, the Foster-Bey case is not compatible enough with this case on all claims, so as to bar this action. If this case was dependent on Foster-Bey the meat of the Plaintiffs' claims would not be heard and settled. On the other hand, if this case moves forth and Foster-Bey does not, everyone of their plaintiffs would be adequately represented. This is not to say the parties cannot come to some agreement.

Be that as it may, without class action certification, these and many other cases will be decided piecemeal, and judicial economy will not be better served. Moreover, the prison officials and their attorney's should not have to face new and endless challenges to the parole board's procedures and changes in law; that would unduly burden the state also. Moreover, class certification will prevent this Court and the Sixth Circuit from the inevitable prospect of a long procession of prisoner-filed section 1983 and section 2254

---

[3] See Rooker v. Fid Trust Co, 263 US 413, 44 S Ct 149, 68 L Ed 362 (1923) and Dist of Columbia Court of Appeals v. Feldman, 460 US 462, 103 S Ct 1303, 75 L Ed 2d 206 (1983). The Feldman Court stated that "United States District Courts ... do not have jurisdiction ... over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those claims may only be had in this Court."

cases. Equally, if the Court certifies the case as a class, the Plaintiffs will have the chance to conduct discovery in a concentrated manner, with the assistance of appointed counsel.

In <u>Dotson v. Wilkerson,</u> 329 F.3d 463, 471 (6th Cir.2003), the Sixth Circuit determined that prisoners can challenge parole procedures via § 1983 rather than habeas). Judge Gilman dissented, but only as to plaintiff Johnson. In fact, Judge Gilman said that, "there is no indication that Dotson's claim ... would vitiate the earlier denial of parole. His appeal is a classic 'claim for using the wrong procedures, not reaching the wrong result' ... Further support for this conclusion comes from the fact that Dotson's lawsuit could just as easily have been cast as a class-action claim challenging the retroactive applicability of Ohio's parole-eligibility guidelines." 329 F.3d 463. This action is that case and is practically identical to Dotson.

### i. Numerosity

As noted above, more than 700 prisoners are under the ambit of class definition, and close to 150 fall into the subclass definition. The potential class is large in numbers, which alone demonstrates the impracticability of joinder. <u>Bacon v. Honda of America Manuf'ing, Inc,</u> 370 F.3d (6th Cir.2004). This is a prisoner class action which is comprised of potential members who are scattered throughout the Michigan penal systems fifty prisons. Joinder of separate lawsuits would be impracticable, and to bring all litigants together in one courtroom is simply not possible. Additionally, any plaintiff bringing suits will benefit from having their claims merged into this class. Further, there is yet another strand of lifers who are potential-class members, that is, considering Plaintiff win on their "on its face challenge" to the statute: All persons receiving parolable life terms before, on, or after October 1, 1992, and until said rule is properly promulgated under the APA. Accordingly, this case meets the numerosity criterion.

### ii. Commonality

Because every prisoner sentenced to parolable life prior to October 1, 1992 with and without a Grid score, has and continues to be injured by the Defendants' conduct, the present challenge will raise the same issues of law and fact for all potential plaintiffs

in this case and in <u>Foster-Bey, et al</u>. Indeed, this is the type of case that Rule 23(2)(b) speaks to. See e.g., <u>Dotson</u>, 329 F.3d 463, 477 (6th Cir.2003)("Dotson's lawsuit could just as easily have been cast as a class-action claim challenging the retroactive applicability of Ohio's parole-eligibility guidelines")(dissenting opinion of GILMAN, J.). The parties opposing the class have "acted or refused to act on the grounds generally applicable to the class, thereby making appropriate final adjunctive relief or corresponding relief with the respect to the class as a whole...." This complaint challenges the MDOC system-wide practice and policy that affects all of the putative-class members. Without a class action, individual cases raising the same claims could not easily be tracked or consolidated, and they would raise the substantial risk of multifarious opinions and judgments. Because some of the core questions of fact and law raised by this complaint are common and at the heart to all members of the class and subclass, class certification is appropriate. <u>Sprague v. General Motors Corp,</u> 133 F.3d 388, 397 (6th Cir.1998). Commonality exists and class certification is appropriate.

### *iii. Typicality*

All parties to these suits raise challenges to the changes in Michigan's parole statute in 1992 and 1999; all parties raise <u>ex post facto</u> and due process claims; all parties assert that the retroactive application of the changes in law coupled with the Defendants new life means life policy has substantially disadvantaged them to the point where they may die in prison. The two issues raised in <u>Foster-Bey</u> are typical enough so that their action can safely be merged into this action, <u>Lynch-Bey v. Caruso,</u> without any disadvantage to them. The two claims raised in <u>Foster-Bey</u> are at the heart of the claims in <u>Lynch-Bey</u>, however, <u>Lynch-Bey</u> goes a step further beyond the language of the statute to show violations that are not so conspicuous. For example, the semantic erosion of the meaning of "eligible"; failure to promulgate life means life policy as rule with force and effect of law; failure of director of MDOC to promulgate rules to govern decision making criteria in lifer cases; language in statutory amendments making public safety of first and foremost concern which was the crucial blow in <u>Mickens-Thomas v. Vaughn</u>, 321 F.3d 374, 385-386 (3rd Cir.2003); that <u>as a matter of law</u> parolable lifers are denied consideration, eligibility, suitability for parole; the statute is unconstitutionally vague. These are claims not alleged in <u>Foster-Bey</u>, and it would cause an injury to the <u>Lynch-Bey</u> Plaintiffs not having them addressed on the merits. A win in <u>Lynch-Bey</u> means a win for all lifers, including <u>Foster-Bey</u> and those who have already filed. Thus, "as goes the claim[s] of the named plaintiffs, so goes the claims of the class." <u>Sprague</u>, 133 F.3d at 399 (citation

5

omitted). On the other hand, if the Foster-Bey plaintiffs prove their claims, Plaintiffs here and hundreds of potential-class members will be left out to dry, at least on the claims mentioned above. Thus, the filing in Foster-Bey should have no negative bearing on filing of this case. This case proves Foster-Bey's claims, but is cannot be said that Foster-Bey also proves this case. This case fairly encompasses a broad range of lifers so as to make class certification appropriate.

### iv. Fairness and Adequacy of Representation

The interests of the named Plaintiffs and the putative class are the same. Although Plaintiffs have set forth facts showing that some of their claims will call for a different inquiry, it does not negate the fact that the core questions are the same as in Foster-Bey. Plaintiffs assert that this case adequately represents far more prisoners than Foster-Bey, which excludes lifers convicted and sentenced after October 1, 1992.[4] In any event, this action will represent the putative class vigorously through appointed qualified counsel. There are no conflicts between the named parties here and its putative class; however, there are potential conflicts between the named parties in Lynch-Bey and those named in Foster-Bey. The first prong is met. Rutherford v. City of Cleveland, 137 F.3d 905, 909 (6th Cir.1998)

Plaintiffs will not gain anything by failing to assert the interest of the putative class members. In fact, Plaintiffs allegations are detailed enough to demonstrate a desire to prosecute the putative class vigorously. The common questions of law and fact predominate over individual issues. The common issues allege that Defendants have violated the Plaintiffs' constitutional rights under the ex post facto and due process clauses, by refusing to use the parole decision making standards and criteria in place when their crimes and sentences took place. The named Plaintiffs have consistently researched and prepared these pleadings with the limited legal resources and with almost obsolete materials. The Plaintiffs have invested their time and money, and will continue to do so. The Plaintiffs are sufficiently informed as to the state of law, and unlike most people in the free-world - including many attorney's - they have much time to spend on research.

Plaintiffs do not have the necessary funds to hire counsel, and are requesting

---

4    Clearly there is the possibility of another subclass: All prisoners serving life terms who have been injured by the life means life policy which is not a valid rule because it was not promulgated under the provisions of the APA. This subclass presumes the Court will declare the statute unconstitutional.

appointment of competent counsel. Plaintiffs have satisfied the adequate and fair representation inquiry. <u>Rutherford,</u> 137 F.3d at 909.

### B. Conclusion and Relief

Given the state of affairs, without class certification, there will be various and inconsistent judgments with respect to individual members. The potential risk is obvious when the Court looks to the number of habeas petitions already pending by class members. Notably one of the cases, <u>Moore v. Jackson</u> (No. 04-CV-72344-DT) was denied relief on February 14, 2005 by Chief Judge Bernard Friedman. The risk that another Judge of this Court will rule contrary is high. Moreover, the party opposing the class has refused to act on the grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. The Board's treatment of the eight named Plaintiffs is symptomatic of its treatment of a broad class of inmates serving parolable life terms, and all of the violations stem from the policies and practices of the Board, permeates its facilities, and are condoned by the Director of the MDOC. Finally, the class action device is particularly well-suited in actions brought by prisoners. <u>Dean v. Coughlin,</u> 107 F.R.D. 331, 332 (S.D.N.Y.1985).

Therefore, the Court should certify this case as a class action.


Respectfully submitted by Plaintiffs in <u>pro se:</u>


Anthony Lynch-Bey #146972                    James A. Clark #154102


Holley Davis #116440                         Johnathan Martin-El #173004

Billy Ray Abernathy #150693                  Brian Hagood-Bey #183904


Brian Luckett #217822                        Timothy Granderson #225169


Dated: May 13, 2005

7

# EXHIBIT A

# CAPPS
CITIZENS ALLIANCE ON PRISONS & PUBLIC SPENDING    **News Release**

**FOR IMMEDIATE RELEASE**

Oct. 26, 2004

**CONTACT:** Barbara Levine or
Gail R. Light, CAPPS
(517) 482-7753, cell (517) 862-1202

## Michigan Voters Solidly Support Investment in Crime Prevention, Less Spending on Incarceration

### *Majority of Voters Statewide Favor Change in Parole Policy*

LANSING, MI. – A solid majority of Michigan voters prefer investing *more* resources in crime prevention and *less* on incarceration, according to a recent statewide public opinion poll commissioned by a non-profit citizens' group.

The poll was conducted by the Lansing-based research firm EPIC-MRA for the Citizens Alliance on Prisons and Public Spending (CAPPS), which advocates shifting resources now spent on excessive incarceration to services that prevent crime and rehabilitate offenders.

"Many political races we're monitoring right now may be too close to call, but that is certainly not the case with this poll," said John Cavanagh, secretary-treasurer of EPIC-MRA. "When it comes to corrections issues, Michigan voters are clearly open to a greater commitment to crime prevention programs, less emphasis on prison spending and the opportunity for prisoners who have paid their debt to society to return to the community."

Michigan's prison population has grown from 15,000 to nearly 50,000 in the past two decades. At $1.7 billion, Corrections' share of the general fund budget has quadrupled from 5 percent to 20 percent.

Key findings from the EPIC-MRA study show that:

- Corrections ranks lowest among spending priorities.
- Voters favor a change in parole policies that incarcerate thousands of people who could be safely released.
- Early childhood education is viewed as the most effective crime-reducing approach while long prison terms are viewed as the least effective.
- There is strong support for parole of "good" prisoners and for instituting review of parole board decisions.
- Voters prefer non-prison alternatives for technical parole violations.
- Voters agree that parole should be fair and that prison alternatives save money.

**– MORE –**

# EXHIBIT B



**EPIC ▪ MRA**

4710 W. Saginaw Highway
Suite 5
Lansing, MI 48917
517/886-0860
800/545-8249
Fax 517/886-9176
e-mail: epicmra@mindspring.net

**September 2004 Statewide Survey**
**CAPPS Corrections Issue Questions**

- Corrections ranks lowest among spending priorities

- Parole policy change favored

- Early childhood education viewed as most effective crime-reducing approach – long prison terms, least effective

- Overwhelming majority support for parole of "good" prisoners and for instituting review of parole board decisions

- Heavy support for non-prison alternative for technical parole violation

- Strong agreement with premise that parole should be fair and prison alternatives save money

▪ Educational
▪ Political
▪ Industrial
▪ Consumer

▪ Market
▪ Research
▪ Analysis



**EPIC · MRA**

4710 W. Saginaw Highway
Suite 5
Lansing, MI 48917
517/886-0860
800/545-8249
Fax 517/886-9176
e-mail: epicmra@voyager.net

# EPIC · MRA
## September 2004 Statewide Survey

## CAPPS Corrections Issue Questions

## Executive Summary

- Educational
- Political
- Industrial
- Consumer

- Market
- Research
- Analysis

In its monthly statewide omnibus survey for September 2004, EPIC ▪ MRA included a battery of questions commissioned by the Citizens Alliance on Prisons and Public Spending (CAPPS). A total of 610 interviews were conducted between September 15-19, with registered voters in Michigan, geographically stratified to represent the proportional regional vote contribution to a November election vote total in a presidential election year. The survey carries a margin of error of ±4 percent.

The CAPPS question battery was designed to elicit opinion on the funding priority that should be placed on several competing state government programs, as well as to measure respondents' perception of the crime-reducing effectiveness of several approaches to dealing with crime. The survey also measured the public's attitude toward amending the current manner in which the Michigan parole system operates and renders decisions.

As will be illustrated below, the data coming back from this survey clearly demonstrates willingness on the part of the Michigan public to a retooling of the way in which the state deals with its prison population. The state electorate lists "corrections" as last on a list of several state spending priorities, and views "long prison terms" as the least effective of several approaches to reducing crime. Moreover, there is wide acceptance of prison alternatives as a means to more efficiently spend corrections dollars.

## Corrections Ranks Lowest Among Spending Priorities

In the ranking of budget priorities, respondents were read a list of six major service areas funded by state dollars. They were asked to rate on a scale of 0 – 10, the level of priority the legislature and the governor should give in funding each named area, with zero being the lowest priority, and ten meaning the highest priority.

The following table shows how respondents rank ordered spending priorities for six different government services:

| TOTAL PRIORITY PERCENTAGES | SOME 7 - 8 | HIGH 9 - 10 | TOTAL PRIORITY |
|---|---|---|---|
| Kindergarten-12th grade education | 23% | 67% | 90% |
| Funding for local police and firefighters | 43% | 41% | 84% |
| Public health, including mental health care and nursing home care for seniors | 37% | 46% | 83% |
| Colleges and universities | 37% | 34% | 71% |
| The environment | 40% | 29% | 69% |
| Corrections | 36% | 17% | 53% |

Scores of 7 through 10 were tallied to create a composite "Total Priority" score. As is shown, K-12 education ranks highest on this scale with a total priority score of ninety percent. Conversely, corrections ranks the lowest with fifty-three percent. Perhaps more telling is the relative position

of the K-12 and Corrections service areas when just the very highest, "9 – 10" highest priority scores are compared.

The very last position of corrections, falling better than ten points below the next lowest area of "The environment" strongly suggests that overall, the public might be receptive to a redistribution of budget resources from their mix.

Some subgroups were exceptions to this relative rating position for corrections, giving this government service area composite "Total Priority" numbers much higher than the norm. These groups include: "NASCAR" Females (74%) those in the "North" of Michigan (73%), those in the $30,000 to $40,000 household income range (68%), all respondents under 40 years of age (65%), and those who report "Never" attending church services (63%),

## Parole Policy Change Favored

The notion that the public would be tolerant of some reordering of budget priorities *viz a vis* corrections is reinforced by data from related questions. For instance, the following question was posed to respondents:

> "Michigan spends 1 in every 5 of its general fund dollars, a total of $1.7 billion, to fund prisons. One important reason for increased prison spending has been the decisions of the parole board, comprised of people who have been appointed by the governor, to keep prisoners locked up. There are about 17,000 people in prison who have been kept past the date when they have completed the minimum sentence required by law. If about 7,200 of these prisoners could be safely released, which would save $145 million, do you think the Legislature should take action to change the parole board's policies, or, do you think existing parole policies should be kept?"



*EPIC ▪ MRA September 2004 Statewide Survey*
*CAPPS Corrections Issue Questions*

As seen from the chart above, a solid majority believe the legislature should step in to alter what is described as an unnecessarily expensive parole board policy of routinely denying parole.

## Early Childhood Education Viewed as Most Effective Crime-Reducing Approach – Long Prison Terms, Least Effective

Like the ranking of budget priorities earlier in the survey, respondents were read a list of eight different approaches to reducing crime.  They were asked to rate on a scale of 0 – 10, the level of effectiveness they believed each approach had in crime-reduction, with zero being the least effective, and ten meaning the most effective.

The following table shows how respondents rank ordered the effectiveness of eight different approaches to reducing crime:

| TOTAL EFFECTIVE | EFFECTIVE | | |
|---|---|---|---|
| | SOME 7 - 8 | EXTREME 9 - 10 | TOTAL EFFECTIVE |
| Early childhood education | 30% | 48% | 78% |
| Comprehensive programs for juvenile offenders | 45% | 32% | 77% |
| Increasing the availability of treatment for the mentally ill | 39% | 37% | 76% |
| Reducing high school truancy and drop out rates | 33% | 41% | 74% |
| Programs to decrease child abuse and neglect | 36% | 37% | 73% |
| Substance abuse prevention and treatment | 39% | 27% | 66% |
| Intensive supervision for probationers | 38% | 21% | 59% |
| Long prison terms | 32% | 23% | 55% |

Some subgroups were exceptions to this relative rating position for long prison terms, giving this crime-reducing approach a composite "Total Effective" numbers much higher than the norm. These groups include: Republican Women (71%), Macomb County residents and GOP men (69%), 30 to 35 year olds and those with household income of $60,000 to $75,000 (67%), and those in the "Grand" map region (66%),

## Overwhelming Majority Support for Parole of "Good" Prisoners and for Instituting Review of Parole Board Decisions

By an over three-to-one margin of seventy-five percent to twelve percent, respondents believe parole should be granted to well-behaved prisoners deemed not dangerous, after they have served their minimum sentence.



Those subgroups responding in percentages lower than the norm that prisoners should be paroled after serving their minimum sentence included: 30 to 35 year olds (54%), and those in the Lansing media market and males under 40 (66%)

Similarly, an overwhelming majority of respondents favor a proposal that would make parole board decisions, like sentencing decisions rendered by judges, subject to appeal and/or review.



*EPIC ▪ MRA September 2004 Statewide Survey*
*CAPPS Corrections Issue Questions*

Those subgroups more strongly opposed than the norm to instituting a review process for parole decisions included: Older men (29%), and those in the "North" map region, Republican men, and residents of the Traverse City media market (27%).

## Heavy Support for Non-Prison Alternative for Technical Parole Violation

By a wide margin of 72 percent to 18%, respondents chose electronic tether or county jail for 30 days as preferable to a 2-year return to state prison for violation of conditions of parole not involving a crime.



## Strong Agreement With Premise That Parole Should be Fair and Prison Alternatives Save Money

Respondents were read a rotated list of statements concerning the circumstances of the granting of parole, as well as statements asserting the cost effectiveness of alternatives to prison. They were then asked to agree or disagree with each of those statements. The following table illustrates the results:

|  | AGREE | | DISAGREE | | |
|---|---|---|---|---|---|
|  | *strong* | Total | *strong* | Total | undec |
| Procedures should exist to make sure parole decisions are fair and impartial | *71%* | **94%** | *1%* | **2%** | **4%** |
| A lot of money could be saved in our prison system if non-violent offenders were sentenced to less expensive alternative sentencing options, such an electronic tethers at their home or work, the use of half-way houses or the use of other non-prison alternatives. Such alternatives should be used whenever possible | *60%* | **85%** | *4%* | **11%** | **4%** |
| Where there is no evidence that they are currently dangerous, people who have served their minimum sentences should be given a second chance | *57%* | **85%** | *5%* | **10%** | *5%* |
| Less money should be spent on prisons and more on crime prevention efforts | *45%* | **75%** | *6%* | **17%** | **8%** |
| Too much money is being spent sending people back to prison, even if they have made technical parole violations | *34%* | **59%** | *11%* | **22%** | *19%* |

At thirty-two percent Disagree, only the Lansing media market subgroup voiced significantly stronger disagreement with the last statement (Too much money is being spent sending people back to prison ... ) than the norm.

# EXHIBIT c

# Reform Michigan's Unreasonable Parole Policy

## *State Parole Board too often refuses to consider prisoners who could qualify for release*

Prison inmates who are sentenced to life terms but are eligible for parole should get hearings and written statements that can be appealed. This should be state policy regardless of the outcome of a lawsuit challenging the state's parole procedure.

Not everyone who is given a hearing should be released. But the state's Parole Board should have to justify its decisions in writing, and show the reasons for retaining an inmate. Those reasons should then be appealable in court.

A group of University of Michigan professors and students have filed a class action suit on behalf of those prisoners in the Michigan Corrections system who were given life sentences with the possibility of parole. They contend that a 1992 change in the state's parole policy has wrongly denied these inmates a substantive hearing on their possible release.

Regardless of the legalities of the lawsuit, the state needs a more sensible parole policy. Michigan puts a larger share of its population in prison than any other Midwestern state. The cost of incarcerating prisoners now amounts to nearly 20 percent of the state's General Fund budget, up from slightly more than 6 percent two decades ago. Criminals need to be behind bars, but the state has to find a more cost-effective way to protect the public.

In the particular case brought in federal court, the inmates contend they are unfairly and illegally being denied a real chance at parole, even though the judges that sentenced them expected that they would eventually be released.

Prior to the change in parole policy in the early 1990s, criminals receiving life sentences with a possibility of parole generally served from 10 to 25 years.

But after the state changed parole policy in the wake of particularly brutal murders by a paroled sex offender, it has become much more difficult for those serving life sentences to receive a hearing or be released.

Certainly, those who are sentenced to life with no possibility of parole, in lieu of the death penalty, which Michigan does not have, should serve out their terms.

But even some state judges who imposed life with the possibility of parole now say the current policy is not what they intended. Wayne Circuit Judge Brian Sullivan, a former prosecutor, told The Detroit News the board's actions in simply denying parole are wrong.

Parole policy should guarantee prisoners hearings, written opinions and access to the courts. Aging and ailing prisoners should be let out of prison.

It's estimated that the state can save from tens of millions to hundreds of millions with a more sensible parole policy. Whatever the possible savings, justice alone should motivate a reform of current parole practices.

**Find us!**

Want to send The Detroit News a letter via e-mail? We can be reached at:

**letters@detnews.com**

You can send us a fax at (313) 222-6417. And we can still be reached the old-fashioned way, by mail, at 615 W. Lafayette Blvd., Detroit, MI 48226. Please include home and work phone numbers, plus city of residence. We want to hear from you. Letters become the property of The Detroit News, which owns the rights to publish them online.

detnews.com

April 25, 2005,
The Detroit News

# EXHIBIT D

# Parole Hearings

*Bill rightly seeks timely reviews for parolable lifers*

Michigan's prisons hold nearly 850 inmates who were sentenced to life but are eligible for parole. However, they may not get a fair hearing, because they never see the Parole Board. A bill by state Sen. Mickey Switalski, D-Roseville, would make the process fairer by requiring the Parole Board to see parolable lifers every five years.

Now, the Parole Board doesn't have to interview parolable lifers except once after 10 or 15 years. It must conduct only a paper review of such cases every five years, making it too easy to pass people over. Most of these inmates have served at least 25 years and were under 22 when they committed their crimes.

A class-action lawsuit against the State Parole Board asserts, with some justification, that prisoners sentenced to life with the possibility of parole, mostly for armed robbery or second-degree murder, have been effectively denied any real chance of parole. Judges sentenced many of these offenders, especially before 1992, with an understanding that, legally, life didn't mean life. It meant eligible for parole in 10 or 15 years, though very few received it that soon.

The Legislature ought to require the Parole Board to treat these cases as it does other inmates with parole eligibility. It should also authorize a special Parole Board panel to review them.

To his credit, Parole Board Chairman John Rubitschun has already taken a closer look at some of the cases involving parolable lifers. Last year, the board granted paroles to 12 such inmates, the highest number since 1994 and one of the highest in the last 30 years.

Even so, the Legislature should call for a formal review of all parolable lifer cases and require that the board regularly see all parole-eligible inmates. The cost of such measures would be minimal. The state would actually save money if even a few inmates were safely released from prison, where they each cost nearly $30,000 a year to house.

Serving a minimum sentence shouldn't mean an automatic ticket out of prison, but it should assure a fair and periodic hearing by the Parole Board.

Detroit Free Press, 4/26/05, Editorial Section, p. 6A.